# In re A.H. ROBINS COMPANY, INCORPORATED, Debtor, Employer's Tax Identification No. 54–0486348.

## Bankruptcy No. 85–01307–R.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

May 2, 1995.

Benjamin C. Ackerly, Lewis T. Booker, Tyler P. Brown, Hunton & Williams, Richmond, VA, for movant.

Orran Lee Brown, Richmond, VA, for Dalkon Shield Claimants Trust.

Before MERHIGE, District Judge, and BLACKWELL N. SHELLEY, Bankruptcy Judge.

## MEMORANDUM

This matter is before the Court on over seventy motions to reinstate attorneys' fees, filed pursuant to this Court's Order disallowing unreasonable attorneys' fees, dated March 1, 1995. The Dalkon Shield Claimants Trust ("Trust") appears in its role as fiduciary for all Dalkon Shield claimants.

### I.

On March 1, 1995, this Court issued an Order Disallowing Unreasonable Attorneys Fees On Pro Rata Distribution. This Order was premised upon several factual findings: the likelihood of a substantial pro rata distribution to Dalkon Shield Claimants once all timely and valid late claims are paid in full, the facts that no legal effort will be required to secure such a payment and that counsel will be fully compensated through contingency fee contracts for their efforts in securing the underlying recovery,[1] and the fact that this Court has received numerous complaints regarding attorneys' fees. Since the issuance of that Order, the pro rata distribution is no longer a likelihood, but is instead a near certainty. According to conservative estimates by the Trust, the pro rata distribution could approximate 75% of each claimant's initial recovery. Pursuant to § G.14, the Trustees have determined that there will be no pro rata distribution to claimants whose initial recoveries did not exceed the *de minimis* amount of $725.00.

Four primary factors have combined to permit this bonus distribution. To begin, an unexpectedly large number of claimants have settled their claims under Option 1 of the CRF, which provides a recovery of $725.00 upon a "minimal showing of Dalkon Shield use and injury." CRF § C. Second, the Trust assets have been wisely invested, earning interest income of approximately $830,000,000 over the life of the Trust. Third, the Trust itself has prudently limited its operating expenses, thus leaving an additional amount of approximately $200,000,000 for distribution to claimants. Finally, the Trust has diligently monitored the claims resolution process to ensure full compliance with the goals of the Plan and the related documents under which the case is being managed. Contrary to Movants' assertions, the pool of funds available for the pro rata distribution was neither created nor enhanced through the efforts of counsel.

Many of these factors were unforeseen at the commencement of the Robins bankruptcy. In fact, the Trustees initially were so concerned about the Trust's ability to satisfy all timely claims that they implemented a holdback, pursuant to which any amounts recovered in excess of the Option 3 settlement offer or a set dollar figure, whichever was greater, was withheld from the claimant. The Trustees also agreed to "hold back" their salaries given their concerns. It was not until February, 1995, that the Trustees became convinced that all claims, timely and late, will be paid in full and that a pro rata distribution would be paid.

It was on this basis, as well as the other factual findings recited in the March 1, 1995 Order, that the Court ordered

that attorneys fees charged by counsel to Dalkon Shield Claimants out of any pro rata distribution by the Trust under § G.14 of the [Claims Resolution Facility ("CRF")] in excess of ten percent of the pro rata distribution would be unreason-

---

1. The evidence before the Court reveals that these contingent fee arrangements called for fees between one-quarter and one-half of a claimant's recovery, with most charging one-third.

able and thus are hereby disallowed. Unless reinstated under the terms of this Order, counsel for Dalkon Shield Personal Injury Claimants are prohibited from charging or receiving, directly or indirectly, any compensation or fees, based upon or out of any pro rata distribution received by a Dalkon Shield Personal Injury Claimant from the Trust under § G.14 of the CRF, in excess of ten percent of such pro rata distribution by the Trust to the Claimant.

Order, Docket No. 21865 (March 1, 1995). The Order further instructed any attorney intending to seek reinstatement of his fee to comply with various procedural prerequisites, including the filing of a motion for reinstatement no later than April 17, 1995. The Order also established a hearing date of April 27, 1995, whereby Movants were invited to present their case for reinstatement to this Court. The Trust mailed the Order to over 10,000 attorneys. To date, seventy-six (76) attorneys have filed reinstatement motions, approximately thirty of whom have indicated that they would be present at the hearing.

The brief submitted on behalf of thirty of the movants by local counsel largely summarizes the legal position of all Movants. Movants begin with the premise that this Court lacked the jurisdiction to enter an Order disallowing attorneys' fees. They further argue that the Court, through its Order, improperly attempted to modify the plan and, alternatively, to amend the trust agreement. Turning to the substance of the Order, they contend that this Court lacks the inherent power to regulate attorneys' fees and that, in any event, their fees are reasonable. Finally, Movants argue that there is no justiciable case or controversy in that (1) no claimant has complained to the Court about attorneys' fees[2] and (2) the matter is not ripe for adjudication. In connection with this case or controversy argument, Movants propose that the alleged prematurity of the Court's Order deprives the Movants of due process.

**2.** A factual contention without basis according to the records of the Trust and hence this Court. Specifically, this Court has considered various requests by attorneys to place a lien on the Trust because their clients are contesting their fee and

## II.

### A. Statutory and Plan Jurisdiction

The jurisdiction of a federal court sitting in bankruptcy is prescribed by statute:

Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

28 U.S.C. § 1334(b). Thus, the events comprising the fee disallowance, including the March 1, 1995 Order, the seventy-five Motions for Reinstatement and the April 27, 1995 hearing, must either "arise in" or be "related to" the A.H. Robins Chapter 11 bankruptcy in order to fall within this Court's statutory jurisdiction.

A proceeding "arises in" a Chapter 11 case when it is "not based on any right expressly created by Title 11 but would have no practical existence but for the bankruptcy." *Lux v. Spotswood Constr. Loans,* 176 B.R. 416, 418 (E.D.Va.) (Merhige, J.) (*citing In Matter of Wood,* 825 F.2d 90, 97 (5th Cir.1987)), *aff'd,* 43 F.3d 1467 (4th Cir.1994). The United States Court of Appeals for the Fourth Circuit has broadly interpreted the "related to" language of § 1334(b):

An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994, 1002 n. 11 (4th Cir.) (*quoting Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986)); *see In re Johnson,* 960 F.2d 396, 403 (4th Cir.1992) ("Courts have adopted an expansive definition of what is a

refusing payment. Moreover, this Court has received a large volume of claimant correspondence in which claimants complain about fees charged.

related proceeding.").[3] In further recognition of § 1334(b)'s breadth, the Fourth Circuit agreed that there may be "controversies over which the new bankruptcy courts ... would have jurisdiction even if neither the debtor nor a representative of the estate were a party." *Id.* (citation omitted). On this authority, it is clear that this Court may interpret § 1334(b) liberally, especially where the question at hand involves interpretation or implementation of the Sixth Amended and Restated Plan of Reorganization of the A.H. Robins Company ("Plan").

■ Upon confirmation of the Plan, this Court retained jurisdiction in accordance with the terms of the Plan, the other provisions of this Order, and Section 1142 of the Bankruptcy Code. *See In re A.H. Robins Co., Inc.,* 88 B.R. 742 (Bankr.E.D.Va.) (confirmation order), *aff'd,* 880 F.2d 694 (4th Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989). Pursuant to § 1142,

> [t]he court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act ... that is necessary for the confirmation of the plan.

11 U.S.C. § 1142(b). This section defines the court's post-confirmation authority; specifically, the Court may address any matters "concerning the implementation or execution of a confirmed plan." *Goodman v. Phillip R. Curtis Enters., Inc.,* 809 F.2d 228, 232 (4th Cir.1987).

■ In recognition of this statutory authority, this Court possesses the exclusive retained jurisdiction "to resolve controversies and disputes regarding interpretation and implementation of the Plan, the Trust Agreements [and] the Claims Resolution Facility ['CRF']," and "to enter orders in aid of the Plan, the Trust Agreements, [and] the [CRF]." Sixth Amended and Restated Plan

of Reorganization of the A.H. Robins Company ("Plan") §§ 8.05(c) & (d). The breadth and exclusivity of this jurisdiction has been acknowledged by the Fourth Circuit on several occasions. *Anderson v. Dalkon Shield Claimants Trust,* 42 F.3d 870, 871 (4th Cir. 1994); *Dalkon Shield Claimants Trust v. Reiser,* 972 F.2d 77, 79 n. 1 (4th Cir.1992). In fact, that court has specifically declined to define more narrowly this Court's § 8.05 retained jurisdiction owing to the "unique" general nature of the Robins case. *Official Dalkon Shield Claimants Committee v. Mabey,* 880 F.2d 769, 775–76 (4th Cir.1989). Consequently, where there exists a matter involving the interpretation or implementation of the Plan or any related documents under which the Plan is managed (i.e., a matter "arising in" or "related to" the A.H. Robins Chapter 11 case), this Court is fully and exclusively empowered to address that matter in the first instance.

**B. Jurisdiction to review attorneys' fees**

■ The question as to statutory and Plan authority thus becomes whether or not the limitation of attorneys' fees, payable by claimants out of a pro rata distribution of Trust assets, involves an issue of interpretation or implementation falling within this Court's statutory and retained jurisdiction. The Court answers this question in the affirmative.

The Trust's overriding purpose is to satisfy all Dalkon Shield claims as "fully, fairly and expeditiously as practicable." Claimants Trust Agreement ("CTR") § 2.02. Consequently, the CRF is fashioned

> to provide all persons full payment of valid claims at the earliest possible time consistent with the efficient design and implementation of the claims resolution facility ... by (1) providing an efficient economical mechanism for liquidating claims which favors settlement over arbitration and litigation, *thereby reducing transaction costs.*

---

**3.** Movants emphasize that this definition only specifies the *debtor.* This position, however, wholly ignores the second consideration—whether the handling and administration of the estate is affected by the matter. Moreover, Movants

disregard the Fourth Circuit's acknowledgement, *infra,* that a matter may relate to a Chapter 11 case even where the debtor or its representative is not a party.

CRF § A (emphasis added). Thus, CRF § A dictates that the alleviation of direct transaction costs to each individual claimant is a necessary and critical prerequisite to fully, fairly and expeditiously compensating Dalkon Shield claimants for their injuries. At issue before the Court, therefore, is the relationship between this mandate and the § G.14 pro rata distribution. Clearly, but for the Chapter 11 case, this question "would have no practical existence." *Lux*, 176 B.R. at 418.

Movants essentially assert that no such relationship exists, interpreting CRF § A as calling for the limitation of Trust administrative expenses, not claimant counsel fees. This Court interprets § A differently. Despite Movant's assertions to the contrary, attorneys' fees were certainly among the transaction costs contemplated in CRF § A. Indeed, the primary economic benefit redounding to the advantage of claimants in favoring settlement over arbitration or litigation is a tremendous savings in legal fees and costs. Quite simply, as borne out in the Trusts' records, the Plan's ultimate goal is to ensure that as much money as possible ends up in the pockets of the claimants, and a settlement offer from the Trust, which inherently requires substantially less legal effort, is one method of attaining that result.

4. Given that the March 1, 1995 Order represents an interpretation and implementation of the Plan, any assertion that the Court was attempting to modify the Plan or amend the Trust is wholly unfounded.

5. The Court also relies upon § 105 of the Bankruptcy Code. This provision sets forth the equitable powers of a court sitting in bankruptcy, providing, in part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. The exercise of equitable power under § 105, while broad, is not limitless. Specifically, while § 105 may "encourage courts to be innovative, and even original, these equitable powers are not a license for a court to disregard the clear language and meaning of the bankruptcy statutes and rules." *Official Comm. of Equity Sec. Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir.), *cert. denied*, 485 U.S. 962, 108 S.Ct. 1228, 99 L.Ed.2d 428 (1988). In other words, the exercise of equitable powers under § 105 must be "strictly confined" within the parameters established by the language and intent of the Bankruptcy Code. *Id.* (*quoting Gue-*

To achieve claimant cost minimization and return maximization, this policy must apply to the *entire* claims resolution process. Specifically, the minimization of transaction costs not only applies to the claims resolution process and the settlement versus ADR/arbitration/litigation decision, but must also continue through the Trust's winding down process including the CRF § G.14 pro rata distribution. Only then can the claimants be assured of receiving the fullest form of compensation possible.

▆ In issuing the Order of March 1, 1995, this Court consequently and properly assumed the responsibility of ensuring that transaction costs associated with the § G.14 pro rata distribution are properly minimized within the meaning of CRF § A.[4] This Court *must* shoulder this obligation; otherwise, the claimants' interest in minimizing transaction costs related to the pro rata distribution would remain unprotected as no other competent forum exists to conduct such a review. This is especially true as regards the overwhelming majority of claimants who have settled, or will settle, their claims. On this basis, the Court concludes that the Order of March 1, 1995, and any subsequent review of the reasonableness of attorneys' fees, arise in and relate to the A.H. Robins bankruptcy and come within the Court's exclusive retained jurisdiction as set forth in CRF § 8.05.[5]

*rin v. Weil, Gotshal & Manges*, 205 F.2d 302, 304 (2d Cir.1953)); *see also Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 968–69, 99 L.Ed.2d 169 (1988) (equitable powers limited to confines of Code).

The Bankruptcy Code does not prohibit courts from examining the reasonableness of attorneys' fees. In fact, the Code contains various provisions in different contexts indicating that the court is responsible for monitoring the reasonableness of attorneys' fees in a bankruptcy case. *See e.g.*, 11 U.S.C. § 330(a)(1)(A) ("reasonable compensation" may be paid to professionals); *Id.* § 502(b)(4) (claims for legal services will be allowed as long as the value of the claim does not exceed the "reasonable value" of the services rendered); *Id.* § 503(b)(4) (attorneys' fees will be allowed as administrative expenses as long as they may be considered "reasonable compensation" in considering "the time, the nature, [and] the extent" of such services). Because this Court's scrutiny of attorneys' fees in no way contradicts the language of the Code and is in accord with the Code's general policy of ensuring the reasonableness of legal fees in bankrupt-

### III.

■ Movants contend that an Article III case or controversy does not exist because of their mistaken belief that no party has contested attorneys' fees. They also argue that the matter is not ripe because the payment of the pro rata is only a possibility, not a present controversy.

■ Movants' argument ignores the unequivocal fact that the A.H. Robins bankruptcy is far from over. Indeed, the Court is presently responsible for supervising the management of over $1.4 billion in assets remaining in the Trust, and contested matters arise on a regular basis. As indicated heretofore, the March 1, 1995 order and the related hearing plainly arise in (and/or relate to) this pending bankruptcy and, as such, satisfy the case or controversy requirement of Article III. Moreover, the Court is satisfied that it has the power to review legal fees in this matter *sua sponte.* *E.g., Rosquist v. Soo Line R.R.,* 692 F.2d 1107, 1111 (7th Cir.1982) (citations omitted). Thus, it is irrelevant that a party has not raised a contest regarding legal fees.[6]

■ As regards ripeness, the payment of the pro rata distribution is not a question of "if," but only one of "how much." Thus, any legal challenges to the Court's review of attorneys' fees on the distribution cannot, in essence, become any more ripe for judicial consideration. More importantly, any delay in considering challenges to the Court's review of legal fees will only work to the detriment of the claimants. Specifically, if the motions now before the Court are not considered until the distribution is actually ready to be paid, the claimants' receipt of their proportionate share will be interminably delayed as only then will the legal challenges begin to stir, the hearings be held and the appeals be noted. Such delay and detriment to the claimants runs contrary to their right to the expeditious resolution of their claims. *See* CTR § 2.02; CRF § A. Accordingly, the Court concludes that the issues are fit for "judicial decision" and that "hardship" to the

claimants will be avoided if the Court considers the reasonableness of fees at this time. *See Abbott Lab. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

■ In a ripeness-related argument, Movants allege that a review of attorneys' fees at this time is premature and in violation of their Fifth Amendment rights. This argument can be readily dismissed on the principle that attorney contingency fee contracts are subject to the inherent powers of the court and cannot be construed in the same fashion as ordinary commercial contracts. *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1108 (3d Cir.1979); *Heinzman v. Fine, Fine, Legum and Fine,* 217 Va. 958, 234 S.E.2d 282, 285 (1977); *see also infra.* Moreover, Movants' argument is premised on an unconvincing attempt to package together two distinct issues—the reasonableness of fees charged against a claimant's *underlying recovery* from the Trust and the reasonableness of fees charged against a claimant's *pro rata payment.*

In reviewing the reasonableness of fees, there is a critical distinction between a claimant's underlying recovery on a Dalkon Shield claim and her subsequent receipt of a pro rata payment. The Plan, the Trusts and the CRF have been effectively and uniquely combined to compensate (to date) nearly two hundred thousand claimants out of a $2.4 billion trust. *See Mabey,* 880 F.2d at 775–76. The Trust has just recently determined that a substantial sum of money will be left over for a pro rata distribution in accordance with CRF § G.14. This payment will not be distributed, however, until all Dalkon Shield Claims are paid and all claimants are, thus, *fully compensated* for their injuries.

There can be little doubt that an underlying recovery equates to full compensation. A claimant's acceptance of a settlement essentially translates into a conclusion that the offer amount fairly represents full compensa-

---

cy cases, the Court consequently draws upon § 105 as an additional source of authority in this matter.

6. Section 105 of the Bankruptcy Code likewise permits a court to exercise its equitable powers *sua sponte.* 11 U.S.C. § 105(a).

tion for the injury sustained.[7] Likewise, any jury or arbitration award reflects a third party's belief that the claimant has been fully compensated for her injuries. Once an offer has been accepted or a jury or arbitrator has rendered an award, any efforts requiring specialized legal training, knowledge or skills will have been long completed and a lawyer unquestionably will be entitled to his contractual fee for his efforts in securing the underlying recovery.[8] The calculation and distribution of the pro rata, on the other hand, will not flow directly from the efforts of counsel, as Movants suggest. Rather, the distribution will result from the fortuitous merging of the factors discussed in Part I of this memorandum, and will not require *any* additional legal efforts on the part of counsel.

Thus, while it may be true that it is too early to determine what services will be required to obtain an initial recovery from the Trust with respect to any unresolved claims, it is equally true that the April 27, 1995, hearing afforded all Movants with the opportunity to proffer sufficient evidence of whatever minimal work will be required of attorneys to ensure that their clients receive their pro rata payment. Consequently, Movants had a full opportunity to argue and present evidence in support of their motions.

## IV.

 "[I]t is within the court's inherent power of supervision over the bar to examine the attorney's fee for conformance with the reasonable standard of the Code of Ethics." *Rosquist*, 692 F.2d at 1111; *accord Allen v. United States*, 606 F.2d 432 (4th Cir.1979); *In re Michaelson*, 511 F.2d 882, 888 (9th Cir.1979); *Schlesinger v. Teitlebaum*, 475 F.2d 137, 141 (3d Cir.), *cert. denied*, 414 U.S. 1111, 94 S.Ct. 840, 38 L.Ed.2d 738 (1973); *Farmington Dowel Prod. Co. v. Forster Mfg. Co.*, 421 F.2d 61, 90–91 (1st Cir. 1970); *Cappel v. Adams*, 434 F.2d 1278, 1280 (5th Cir.1970). It is also within the inherent *equitable* powers of a federal court to review the reasonableness of attorneys' fees under contingent fee contracts. *E.g., Krause v. Rhodes*, 640 F.2d 214, 218 (6th Cir.), *cert. denied*, 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981). While a contingency fee may have been reasonable when the contract was signed, intervening circumstances can render a reasonable contract "unfair in its enforcement." *Id.* at 220; *accord McKenzie Constr. Co. v. Maynard*, 758 F.2d 97, 101 (3d Cir.1985). Moreover, the fact that a client is willing to abide by the fee agreement is not dispositive "for the object of the court's concern is not only a particular party but the conformance of the legal profession to its own high standards of fairness." *Rosquist*, 692 F.2d at 1111 (*quoting Farmington*, 421 F.2d at 90 n. 62).[9]

 The language in CRF § G.14, stating that the pro rata distribution will be paid "in lieu of punitive damages," in no way precludes a review of the reasonableness of

---

7. Indeed, claimants who accept their settlement offer (as well those who elect Alternate Dispute Resolution ["ADR"]) sign a release in which they acknowledge that the settlement amount (or any subsequent ADR award) represents full compensation for their injuries.

8. Essentially, an attorney will be compensated for gathering medical records, reviewing them and, based on his review, advising the client as to the appropriate course of action. Once an attorney represents one claimant and, in that process, generally learns the "medicine" involved in a Dalkon Shield case, subsequent representations are largely mechanical and ministerial. This is especially true in light of the Trust's stringent no negotiation policy that endures during the *entire* claims resolution process. The primary exception to this general principle is the relatively small group of claimants who elect to proceed to arbitration or litigation. Nevertheless, the undisputable fact remains that the claims resolution process was designed to render legal assistance unnecessary throughout the settlement phase of the claims resolution process.

9. Movants, citing *Dunn v. H.K. Porter Co., Inc*, 602 F.2d 1105, 1111–12 (3d Cir.1979), argue that pre-petition fee contracts are presumptively reasonable and that post-petition contracts, at the least, warrant a full hearing. Given the extraordinary circumstances surrounding the instant matter as well as the entire Robins bankruptcy, the Court is not persuaded that pre-petition contracts should be considered any differently than those entered into post-petition during the Court's inherent power inquiry. Nor should a distinction be drawn while assessing the *overall* reasonableness of fees charged on the pro rata distribution. The Court, however, has *not* foreclosed the opportunity for Movants to suggest in their *individual* cases that such a distinction should be made.

attorneys' fees. Even if the Court accepts Movants' argument that the pro rata distribution and the underlying recovery should be considered as a package recovery, which it does not, this Court undoubtedly possesses the power to review fees purportedly charged upon such a package. Thus, this language of § G.14 has no relevance as regards this Court's power to review attorneys' fees.

### A. Inherent power to supervise the bar

■ In overseeing members of the bar, this Court must seek guidance from the Virginia Rules of Professional Responsibility. E.D.Va.R. 7(I) & E.D.Va.Bankr.R. 105(I). Disciplinary Rule 2–105(A) requires that a lawyer's fee be "reasonable." The Standing Committee on Legal Ethics of the Virginia State Bar interpreted this section in the context of contingency fee agreements in Legal Ethics Opinion 1461. In particular, the committee addressed a situation in which a minor child, injured by an automobile, was represented by an attorney under a contingency fee agreement calling for the payment of "one-third of all money recovered." Va. Standing Comm. Legal Ethics, Legal Ethics Op. 1461 (1992). A personal injury suit was filed on the child's behalf against the driver. In the meantime, the child's parents' insurance company agreed to pay for all medical expenses. The attorney consequently sent the bills to the carrier who provided medical compensation payments in accordance with the policy.

On these facts, the committee addressed the following inquiry: "whether ... it is proper for the attorney to receive his one-third contingent fee out of this medical compensation payment." *Id.* After characterizing the efforts to secure these medical payments as "merely ministerial in nature" and acknowledging that a contingent fee *may* be appropriate if recovery of the payments required "specialized legal knowledge or experience," the Committee concluded that

"where such payments could be obtained by the client without the services of an attorney, a contingent fee for securing these payments would be **per se unreasonable**" within the meaning of DR 2–105(A). *Id.* The Committee rationalized this conclusion by noting that where a matter does not involve an inherent risk of non-payment and merely entails the performance of ministerial tasks, contingent fee arrangements are generally inappropriate. *Id.; accord* Va. Standing Comm. Legal Ethics, Legal Ethics Op. 1606 (1994) ("This Committee ... continues to believe that ministerial matters that carry no risk, such as recovering funds that could be obtained by the client without the services of the lawyer, are not matters in which a contingent fee arrangement is proper....").

These opinions, while not binding on the Court, are most cogent on the facts of the instant matter, especially since existing case precedent is of little assistance. As indicated in Part III of this Memorandum, there will be no legal efforts required to secure a claimant's pro rata distribution. The only imaginable efforts required of attorneys will be the ministerial acts of calculating his client's pro rata distribution, ensuring that he has his client's correct address, typing an envelope and mailing a check to his client. In light of these considerations, the Court determines that, absent a showing of exceptional circumstances, any fee exceeding 10% of a pro rata distribution is "per se" unreasonable, shocks the conscience of the Court, and will be disallowed pursuant to this Court's inherent powers to supervise the bar.[10]

### B. Inherent equitable powers

■ The Court has broad equitable powers to attain the same ends. As stated heretofore, existing precedent provides little guidance given the nature of this case. Many cases, for example, involve a limitation of fees under Federal Rule of Civil Procedure 23 in a class action context. Whatever the procedural posture, the *substantive con-*

---

10. It is to be borne in mind that counsel has already received, in the vast majority of instances, fees of at least one-third of the *gross* settlement amount, plus costs. These fees, in many instances, exceed $100,000.00 per claim, and the aggregate fees received by some counsel, espe-

cially those with hundreds of cases, runs as high as several million dollars per attorney or law firm. Generally, the sole efforts related to such compensation consist of garnering medical records and advising a client whether to accept a non-negotiable settlement offer.

*cerns* expressed by various courts that have limited attorneys' fees are fully applicable in this case.

Most recently, the Southern and Eastern Districts of New York approved a new class settlement proposal in the Johns–Manville class action litigation, which included a 25% cap on attorneys' fees recoverable by counsel. The courts relied on Federal Rule of Civil Procedure 23 as well as their "supervisory power over members of the bar and [their] obligation to safeguard the rights of mass-litigation plaintiffs." *In re Joint Eastern and Southern Dist. Asbestos Litig.,* 878 F.Supp. 473, 559. In this regard, the courts made some pertinent observations:

> In *any* mass tort case, there is an opportunity for a small number of attorneys, each individually representing large numbers of potential claimants, to secure for themselves huge attorneys' fees under individual contingency fee contracts that bear little or no relation to the actual work to be done or the risks in the case. The problem is particularly acute in the context of a stipulated settlement such as the instant one, where subsequent legal work on behalf of most individual claimants will be relatively routine, mechanical and almost certain to result in recovery.

878 F.Supp. at 558 (emphasis added). The Court also noted the "reality" that

> the attorney and client must be considered together for purpose of deciding reasonable fees. In general, the claimants in a mass tort case receive less than they deserve under a perfect system of compensation, while the attorneys get more. Some of the "loss" in compensation can fairly be shifted from the clients to their attorneys.

*Id.* at 561.

This Court subscribes fully to this commentary. Throughout the Robins bankruptcy, a relatively small number of lawyers have represented a large number of claimants. These lawyers, in general, have been paid handsomely considering the low risk levels involved in the generally routine and mechanical representation of Dalkon Shield Claimants. This is not to say that attorneys lacked diligence in representing their clients, especially in the few cases which have proceeded to arbitration or litigation; rather, the Court determines that attorney compensation on the underlying recovery, ranging from one-quarter to one-half of the amount recovered, is commensurate with the risk level and degree of *legal* skill required of such representation.[11]

Now that the Trust has concluded that sums separate from and in addition to any underlying recovery will be automatically paid to claimants on a pro rata basis, the time has come for this Court to exercise its inherent power to protect the interest of claimants in maximizing the recovery to which they are entitled. Indeed, the Court has the "obligation to ensure that the fruits of the [pro rata distribution] are not denied to [the claimants] by unnecessary and inappropriate legal expenses," especially since "plaintiffs in class *and other mass actions* are typically less sophisticated and aware of the rights at stake and the fairness of legal charges than the attorneys who represent their interests." 878 F.Supp. at 560 (emphasis added); *see also Rosquist,* 692 F.2d at 1111 (*courts should be more willing to review* attorneys' fees where plaintiffs are disadvantaged in assessing their rights and bargaining accordingly); *Dunn,* 602 F.2d. at 1109 (inherent power more frequently exercised when clients are "especially vulnerable to overreaching").

In summation, the Court concludes that any fee in excess of 10% of a claimant's pro rata payment is per se unreasonable under DR 2–105(A) of the Virginia Rules of Professional Responsibility. Upon distribution of the pro rata amounts, the lawyers generally will have been fully paid for all their efforts expended on the underlying claim and any further services in relation to the pro rata distribution will be purely ministerial. Moreover, fees imposed on the distribution in excess of 10% will only deprive claimants, who plainly stand at a comparative disadvan-

---

11. For example, the Court again notes that there are absolutely *no negotiations* during any stage of the claims resolution process. *See supra* note 8.

tage in this situation, of their full and just recovery. Consequently, such fees shock the conscience of this Court and, absent extenuating circumstances, will be disallowed.

### V.

■ Even though the Court concludes that fees in excess of 10% are per se unreasonable given the unique nature of the Robins bankruptcy, including the claims resolution process and, most recently, the announcement of a pro rata distribution, the Court will nevertheless conduct the reasonableness inquiry mandated by the Fourth Circuit in *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226–27 (4th Cir.), *cert. denied*, 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978). Under *Barber*, a district court must make "detailed findings with regard to the twelve factors relevant to the determination of reasonable attorneys' fees in any case where such determination is necessary." *Id.* (*citing Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (1974)). These factors include:

(1) the time and labor expended;

(2) the novelty and difficulty of the questions raised;

(3) the skill required to properly perform the legal services rendered;

(4) the attorney's opportunity costs in pressing the instant litigation;

(5) the customary fee for like work;

(6) the attorney's expectations at the outset of the litigation;

(7) the time limitations imposed by the client or circumstances;

(8) the amount in controversy and the results obtained;

(9) the experience, reputation and ability of the attorney;

(10) the undesirability of the case within the legal community in which the suit arose;

(11) the nature and length of the professional relationship between attorney and client; and

(12) attorneys' fees awards in similar cases.

*Id.* at 226 n. 28.[12]

To reiterate, by the time the pro rata is distributed, all claimants will have been fully compensated for their injuries, and their attorneys will be entitled to their corresponding fee as full compensation for their efforts in securing their client's underlying recovery. This Court does not purport to review any fees received on the underlying claim. Rather, the Court will review the reasonableness of fees payable only out of the pro rata distribution and will apply the *Johnson* factors accordingly.[13]

Applying these factors to this Court's review of fees charged on the pro rata distribution, while somewhat difficult given the unusual nature of this matter, reveals that fees in excess of 10% on any pro rata distribution are unreasonable. To reiterate, attorney efforts expended on the pro rata will be absolutely minimal, requiring little time or legal expertise and involving little risk. Second, while questions may arise regarding the calculation of a claimant's pro rata share or the validity of a claimant's address, there will be no legal questions involved in forwarding the payment to the claimants. Third, there is little or no opportunity cost in assuming the

---

12. Movants argue that the appropriate question is whether the "fee" is reasonable, not whether the "percentage" is reasonable. From this premise, they state that there is not yet any "fee" that can be considered reasonable or unreasonable in this matter because the pro rata has not been distributed.

This argument is unpersuasive. Indeed, a legal fee can either refer to an hourly dollar rate, a flat dollar rate or a contingency percentage. *See* Black's Law Dictionary 614 (6th ed. 1990) (defining "attorney fees" as a "[c]harge to client for services performed (e.g., hourly fee, flat fee, contingency fee)"). Thus, a court is free to examine the reasonableness of a percentage as well as

absolute dollar amounts, especially under the facts of the instant matter.

13. Movants argue that the proper focus should be on an attorney's efforts throughout the representation and that assessing reasonableness of fees at this juncture is not possible because many offers remain outstanding and many ADR hearings, arbitration hearings and court cases remain pending. This argument, however, assumes that which this Court has already rejected—that the pro rata payment is the direct result of attorney effort and part and parcel of the compensation of underlying claims. To the contrary, the pro rata must be considered a "bonus" payment separate and distinct from the underlying awards.

ministerial tasks associated with the distribution, as related efforts will take little or no time. As for the fees customarily charged for such services, the Standing Committee on Ethics of the Virginia State Bar plainly concludes that compensation for ministerial acts should be minimal. Fifth, no Movant can legitimately claim that he expected, from the outset of this litigation, to receive compensation through a pro rata payment to claimants; indeed, the Trustees were unsure of the Trust's ability to compensate all timely claims, not to mention its ability to make a bonus payment, until relatively recently.[14] Sixth, any amount in controversy and any results obtained will not flow from the efforts of counsel, but will depend entirely on the funds remaining in the Trust after the full payment of all underlying claims. *See supra* Part I (discussing factors contributing to the creation of the pool of funds available for the pro rata distribution). Finally, the remaining factors (#'s 9–12) are, as the Trust notes, difficult to apply to this case as they seem more applicable to a pure litigation context. However, even if they are deemed to militate in favor of Movants, the Court concludes that the factors previously addressed far outweigh any that favor Movants and that, under the *Barber* test, fees exceeding 10% of any pro rata distribution are unreasonable and will be disallowed.

## VI.

In summary, the Court concludes that it has jurisdiction to limit attorneys fees charged on the pro rata distribution. The Court is also convinced that a case or controversy exists within the meaning of Article III of the United States Constitution. Finally, the Court, in drawing upon its inherent powers to review attorneys' fees, concludes that fees charged on the pro rata distribution in excess of 10% are both *per se* unreasonable and unreasonable under *Barber*. This Court will never lose sight of the underlying goal of the Plan: full, fair and expeditious compensation to the hundreds of thousands of women injured by the Dalkon Shield. This goal in no way suggests that attorneys should not be reasonably compensated for their efforts. It does, however, dictate that they should be barred from charging fees that unreasonably take monies from the claimants, thus shocking this Court's conscience. Because fees in excess of 10% of any pro rata distribution generally may be so characterized, they will be disallowed, subject to reinstatement under the terms of this Court's Order dated March 1, 1995.[15]

---

**14.** Moreover, the record reveals that many Movants fought Plan confirmation on the specific belief that there were insufficient funds in the Trust to compensate all claimants on their underlying claims.

**15.** The Court is mindful that there may be, at a later date, situations in which an attorney is aggrieved by this disallowance based on events occurring after the date of this Memorandum. For example, assume that six months from the date of this Memorandum an attorney who has *never* before represented a Dalkon Shield claimant is retained by a claimant who has rejected her offer and wishes to proceed to litigation. The retained attorney, unaware of the instant matter, agrees to represent the claimant for a nominal fee plus costs. In such an extraordinary case, the aggrieved attorney will be permitted to petition this Court for reinstatement of fees charged on the pro rata distribution under terms and conditions similar to those set forth in this Court's Order dated March 1, 1995.