**In re A.H. ROBINS COMPANY, INC., Debtor.**

**Employer's Tax Identification No. 54–0486348.**

**In re Stan L. LINKER, Esq.**

**No. 85–01307–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

March 10, 1997.

See also 182–B.R.–128, 86–F.3d–364.

Orran Lee Brown, Richmond, VA, for Dalkon Shield claimants Trust.

## MEMORANDUM

MERHIGE, District Judge.

This matter is before the Court on the Motion Of Stan L. Linker ("Linker") For Reinstatement Of Attorney's Fees. (Docket No. 22991). For the reasons which follow, the Court will deny the Motion.

### I.

On March 1, 1995, this Court entered an Order Disallowing Unreasonable Attorneys Fees on Pro Rata Distribution (the "March 1 Order") (Docket No. 21865). Paragraph 2 of that Order prohibits counsel for Dalkon Shield personal injury claimants from "charging or receiving, directly or indirectly, any compensation or fees, based upon or out of any pro rata distribution received by a Dalkon Shield Personal Injury Claimant from the Trust ... in excess of ten percent of such pro rata distribution." This Court rejected all challenges to its jurisdiction to enter the March 1 Order. That ruling was unanimously affirmed by the Court of Appeals for the Fourth Circuit. *In re Robins Co. (Order Limiting Attorneys Fees)*, 182 B.R. 128 (E.D.Va.1995), *aff'd*, 86 F.3d 364 (4th Cir.1996).

The March 1 Order also prescribed a procedure to be followed by any attorneys or firms who objected to the disallowance and wished the Court to consider reinstating fees above the ten percent limit. The procedure included the requirement that such motions to reinstate fees be filed with the Court no later than April 17, 1995. The Order gave notice of the opportunity for argument and an evidentiary hearing before the Court. On April 28, 1995, Linker appeared before the Court and presented evidence in support of his Motion For Reinstatement Fees. However, having stayed entirely the proceedings on all of the individual motions to reinstate fees during the pendency of the appeal (Docket No. 23514), this Court never addressed the merits of Linker's Motion.

Following the unsuccessful appeal to the Fourth Circuit, Court entered an Order dated September 17, 1996 addressing the sixty-two motions to reinstate fees still pending before the Court. (Docket No. 29532). That Order directed certain movants to file by November 1, 1996 their proposed findings of fact and conclusions of law in support of their motions to reinstate fees. Because Linker had already made such a submission, the Court did not require him to file any additional materials. The matter is now ripe for disposition.[1]

### II.

Linker is an attorney from Salinas, California who has represented Dalkon Shield claimants since 1983. (Mot. at 4). The record reflects that Linker has represented 141 claimants pursuant to a standard contingency fee contract. (Tr. at 440–41).[2] The fee agreement called for Linker to receive one-third of a claimant's gross recovery, and for Linker to be reimbursed for the costs associated with the collection of the claimant's medical records. (Tr. at 441–42).

With the exception of several claims filed by the husbands of certain Dalkon Shield users, all of the claimants represented by Linker were clients prior to the filing of the Robins bankruptcy petition in August 1985. Linker testified that he felt that it would have been a conflict of interest for him to accept representation of any new claimants after the bankruptcy filing because such new claimants would deplete the funds that would be available for the payment of existing claims. (Tr. at 444; Mot. at 6). Linker also states that he was actively involved in the bankruptcy phase of this case, having appeared before the court on several occasions and attended the confirmation and estimation hearings. (Mot. at 6).

Linker testified that he had twenty-one cases "in litigation" at time of bankruptcy petition. (Tr. at 444). Of these twenty-one cases, twelve were cases in which lawsuits

---

1. The Trust takes no position with respect to Linker's Motion.

2. "Tr." refers to the transcript of the hearing held on April 28, 1995.

had been filed and discovery had commenced. (Tr. at 444–45; Ex. B).[3] The remaining nine cases were suits which were fully prepared for trial and in which settlement negotiations were being conducted at the time of the bankruptcy filing. (Tr. 444–45; Ex. C).

Linker states that he ultimately received fees from seventy of his 141 clients. (Ex. A). Because Linker presented no evidence regarding the total amounts recovered by his clients, the Court is unable to determine how much Linker retained in fees. Linker does state, however, that his law practice suffered during the pendency of the bankruptcy proceedings and offers some evidence in support of this contention. (Mot. at 5).[4]

Linker's Motion For Reinstatement asks the Court to draw a distinction between *pre-bankruptcy* attorney-client fee agreements and *post-bankruptcy* attorney-client fee agreements, and permit attorneys with pre-bankruptcy agreements to retain more than ten percent in fees. (Mot. at 9–10). In support of this distinction, Linker first argues that the risks he assumed by representing clients prior to the bankruptcy were materially greater than the risks assumed by attorneys who were retained after the bankruptcy petition. Linker contends that the pre-bankruptcy risks included unknown discovery costs, a possible trial, and, most importantly, an uncertain result. Conversely, the post-bankruptcy risks were greatly reduced by the existence of the Trust's claim evaluation process and a guaranteed fund from which recovery could be obtained.

Linker also asks the Court to distinguish pre- and post-bankruptcy cases because pre-bankruptcy cases required significantly more work than post-bankruptcy cases. Unlike the post-bankruptcy claim process, Linker's pre-bankruptcy litigation efforts involved much more than the mere collection of medical records and the submission of a claim form to the Trust. For these two reasons,

Linker insists that it would be "manifestly unjust" for post-bankruptcy attorneys to receive the same compensation as pre-bankruptcy attorneys. (Mot. at 10).

### III.

Linker presents a somewhat compelling case for relief from the ten percent limit on attorneys fees. Linker's protracted involvement in this case has required him to expend considerable resources; first in preparing cases for trial, then in participating in the bankruptcy, and finally in filing claims with the Trust. The Court is satisfied that Linker was required to perform more work per client than an attorney who only represented claimants after the bankruptcy. In some instances, therefore, it is possible that Linker received the same compensation as a post-bankruptcy attorney, even though Linker assumed a greater risk and performed more work.

While the Court recognizes Linker's efforts on behalf of his clients, the Court nevertheless finds that Linker's protracted involvement in this case does not constitute the type of "extenuating circumstances" that this Court has held to be required in order for an attorney or firm to be entitled to a fee of more than ten percent. *Robins (Order Limiting Attorneys Fees)*, 182 B.R. at 138. In reaching this conclusion, the Court is guided by the fact that the Fourth Circuit has stated that the pro rata payment is a "bonus" that is paid over and above the amount of an individual's full settlement of a claim. *Robins*, 86 F.3d at 39–70, 375. Moreover, this Court has determined that the availability of pro rata payments did not result from the legal efforts of counsel, but from the effective management of the Trust. *Robins (Order Limiting Attorney Fees)*, 182 B.R. at 136. Accordingly, when considering pro rata fees, this Court's focus is not on an attorney's

---

3. "Ex." refers to the exhibits attached to Linker's Proposed Findings Of Fact And Conclusions Of Law In Support of Motion For Reinstatement Of Attorney's Fees filed July 15, 1996. "Mot. Ex." refers to exhibits submitted with Linker's original Motion For Reinstatement filed April 14, 1995.

4. Linker submitted copies of his tax returns for the three years preceding the bankruptcy which indicate that his income averaged over $75,000 per year. (Mot.Ex. A). In 1986, however, Linker's adjusted gross income was only $12,037. (Mot.Ex. B).

**536**

efforts on the underlying claim, but on the efforts required for the client to receive the pro rata payment.[5] In the instant case, the mere fact that Linker has, as compared to other Dalkon Shield attorneys, expended more resources in obtaining the maximum settlement for his clients, does not entitle him to charge a higher fee for the ministerial task of forwarding his clients their pro rata distributions.

Finally, to the extent that Linker suggests that he is entitled to relief because he earned no fees from forty-eight clients who received de minimis offers from the Trust, the Court notes that Linker's situation is no different from other attorneys who accept cases on a contingency basis, expend considerable resources, and who ultimately do not prevail. The Court is not persuaded that Linker is entitled to a higher fee by virtue of the fact that pursued certain claims which the Trust determined did not warrant compensation.

### IV.

The Court finds that Linker has failed to present the type of "extraordinary case" or "extenuating circumstances" that would justify relief from the Court's March 1, 1995 Order. *See id.* at 138, 140 n. 15. In the absence of such a showing, the ten percent fee is "not only reasonable, but overly generous." *Robins*, 86 F.3d at 377. Linker's Motion will be denied.

---

5. *See Robins (Order Limiting Attorney Fees)*, 182 B.R. at 135 ("[T]he reasonableness of fees charged against a claimant's underlying recovery from the Trust and the reasonableness of fees charged against a claimant's pro rata payment [are two distinct issues]. In reviewing the reasonableness of fees, there is a critical distinction between a claimant's underlying recovery on a Dalkon Shield claim and her subsequent receipt of a pro rata payment.").